```
                                    ┌─────────────────────────────────┐
                                    │ USDC SDNY                       │
                                    │ DOCUMENT                        │
                                    │ ELECTRONICALLY FILED            │
                                    │ DOC #:_____            │
                                    │ DATE FILED: 7|13|2020           │
                                    └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

FELIPE BARAJAS,

                  Defendant.

No. 18-CR-736-04 (NSR)

AMENDED OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

On May 22, 2020, Defendant Felipe Barajas ("Barajas") filed a motion to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Section 3582(c)(1)(A)"). (Def. Emergency Mot. to Modify Sentence ("Mot."), ECF No. 111.) Barajas maintains that continued incarceration at Grady County Law Enforcement Center in Chickasha, Oklahoma ("Grady") would threaten his health given its inability to provide him adequate medical attention and protection from the Coronavirus Disease of 2019 ("COVID-19"), which Mr. Barajas has contracted. (Id.) The Government opposes Mr. Barajas's application. (Gov't Letter Opp. to Mot. ("Opp."), ECF No. 115.) It argues that, because Mr. Barajas has not demonstrated he is at a "high risk" of experiencing complications from COVID-19, he has failed to set forth an "extraordinary and compelling reason" for his release. (Id. at 4-5.) The Court conducted telephonic hearings on June 17 and June 25, 2020. It then held a telephonic evidentiary hearing on July 1, 2020, where it heard testimony from (1) Mr. Barajas, (2) Dr. William Cooper ("Dr. Cooper"), Chief Medical Officer for Turnkey Health Clinics,[1] (3) Nurse Guinevere Sanders ("Nurse Sanders"), Turnkey's Nurse Manager, and (4) Beatriz Torres, a family friend of Mr. Barajas.

For the following reasons, Mr. Barajas's motion is GRANTED. As will be detailed below, the Court modifies Mr. Barajas's sentence so that he will serve the remainder of his incarceration in home

---

[1]    Turnkey is a private company that specializes in correctional health operations and provides medical services to Grady's inmates.

confinement.  Mr. Barajas, however, must remain in isolation at Grady until, under applicable Centers for Disease Control and Prevention ("CDC") guidelines, he is medically cleared to re-enter the public.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the parties' submissions and witness testimony.

### A.  Mr. Barajas's Current Sentence and Incarceration

On October 10, 2018, Mr. Barajas was charged in a one-count indictment with conspiracy to distribute, and possess with intent to distribute, controlled substances.  (ECF No. 1.)  Specifically, Mr. Barajas was charged with conspiring to distribute, and to possess with intent to distribute, 5 kilograms and more of cocaine, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(B).  (*Id.*)  On September 5, 2019, Mr. Barajas appeared before the Honorable Lisa Margaret Smith and pleaded guilty, pursuant to a plea agreement dated August 9, 2019, to the lesser-included offense charged in Count 1, to wit, conspiracy to distribute 3.5 kilograms and more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). (Presentence Investigation Report ("PSR"), ECF No. 78, ⁋ 5.)

On December 10, 2019, Magistrate Judge Smith recommended that the Court accept Mr. Barajas's plea allocution (ECF No. 84), and on December 17, 2019, the Court accepted his allocution (ECF No. 86).  On January 17, 2020, the Court sentenced Mr. Barajas to a below-guidelines sentence of 27 months' imprisonment, to be followed by three years of supervised release.  The Court entered judgment on February 11, 2020.  (ECF No. 91.)

Mr. Barajas has been in custody for the above-described offense since October 11, 2019. (Mot. ⁋ 3.)  On January 22, 2020, Mr. Barajas was transferred from Westchester County Jail into the custody of the Bureau of Prisons ("BOP") at the Orange County Correctional Facility ("OCCF") in Goshen, New York.  Several months later, on or about April 28, 2020, BOP transferred Mr. Barajas from OCCF to Grady.  (*Id.* ⁋ 4.)  As the Government explains, Mr. Barajas is temporarily housed at Grady

because the U.S. Marshals Services ("USMS"), on behalf of BOP, is in the process of transporting him to another facility.  (Opp. 2.)  Mr. Barajas will complete his sentence on September 9, 2020.  (Mot. ¶ 3.)

**B.  Mr. Barajas's General Health**

Mr. Barajas is a 36-year-old male, and, according to his OCCF medical records, he appears to generally be in good health.  Barajas reported during his "Receiving Screening" with medical providers that he did not have underlying medical conditions such as diabetes, high blood pressure, asthma, or COPD.  (*See* OCCF Receiving Screening Dated 1/22/2020 at 1-3.)  Mr. Barajas did report taking medication for lower back pain (*id.* at 3), which, he explains, is related to muscular and neurological damage he suffered during a 2017 electrocution accident.  (Mot. ¶ 16.)

Mr. Barajas, however, maintains that his medical records do not tell the whole story.  In his motion, he avers that he suffers from an undiagnosed bronchial ailment, possibly asthma, which compromises his breathing.  (*Id.* ¶ 15.)  Testimony and evidence submitted to the Court appears to at least corroborate his position.  For example, Dr. Cooper confirmed that, after a court-ordered examination by a pulmonologist, Mr. Barajas was prescribed an inhaler in part because of a reported history of asthma.  Similarly, in a report submitted by Dr. Bushra Siddique, an infectious disease specialist, Mr. Barajas had reported that he had complained of asthmatic conditions in 2011 and had an inhaler prescribed, although he never filled the prescription.  (6/30/2020 Infectious Disease Report.)

Mr. Barajas also points to some additional recent medical issues.  He avers that in February 2020, he suffered from an internal hemorrhage.  (Mot. ¶ 15.)  Staff indicated that the hemorrhage was caused by a blood clot in his head, which may have been the result of an earlier trauma.  (*Id.*)  Finally, as detailed in a Healthcare Request dated April 16, 2020, Mr. Barajas suffered from an ear infection, which had caused a headache in his right side.  (4/17/20 OCCF Healthcare Request.)

**C.  Barajas's Illness and Subsequent Treatment and Testing at Grady**

Prior to his transfer to Grady, Mr. Barajas was screened by BOP for COVID-19.  (4/27/2020 Prisoner in Transit Medical Summary.)  That screening indicated that Mr. Barajas did not present a fever, cough, or difficulty breathing.  (*Id.*)  However, on or about May 3, 2020, Mr. Barajas testified that he began presenting symptoms such as fever, headache, body aches, chills, difficulty breathing, and a dry cough.  (Mot. ¶ 5.)  Mr. Barajas repeatedly attempted to obtain treatment for his symptoms during the month of May, and he was seen by medical staff on three occasions.  Notably, as Mr. Barajas explains in his motion, all examinations took place during the morning rather than at night, when his symptoms— and, in particular, his fever—were most severe.  (Mot. ¶¶ 6, 8.)

Mr. Barajas first made medical requests on May 3 and May 4, 2020, complaining about a "little fever," "headaches," and a sore body.  (Medical Req. #6,543,618; Medical Req. #6,548,562.)  Mr. Barajas was then examined on May 5, 2020. (Mot. ¶ 6.)  Medical records from that examination characterized Mr. Barajas's ailments as a "common cold."  (5/5/2020 Nurse Protocols Document.)  Although Mr. Barajas's temperature was 98.6 degrees, the notes indicate that he exhibited symptoms such as "[r]unny nose," "[b]ody aches," and a "[h]eadache. (*Id.*)  The record also reveals that his neck glands were "swollen."  (*Id.*)  The overall medical assessment was that Mr. Barajas had an "[a]lteration in comfort related to mild upper respiratory congestion," and he was prescribed acetaminophen for his pain.  (*Id.*)  Mr. Barajas also testified that he was instructed to drink plenty of water.  Mr. Barajas was not administered a COVID-19 test, and his symptoms continued to persist after the examination.

On May 14, 2020, Mr. Barajas submitted a new medical request, this time complaining about a headache and body aches.[2]  (Medical Req. #6,591,216.)  By May 15, 2020, Mr. Barajas noticed he had lost his sense of smell and taste.  (Mot. ¶ 7.)  When Mr. Barajas was finally seen on May 18, 2020, the

---

2      In the request, Barajas also indicated he had asthma and wanted an inhaler.  The nursing staff, however, noted that there was no pending order for an inhaler for him.

examination indicated that Mr. Barajas had been "having chronic headaches" and "body aches." (5/18/2020 Provider Note.)  Mr. Barajas, however, denied having a fever.  (*Id.*)  The provider directed that Mr. Barajas receive Tylenol, and he requested a follow-up for a later date.  (*Id.*; *see also* 5/18/2020 Req. for Medical Needs.)  Mr. Barajas testified that he was again instructed to drink lots of water because the staff thought his condition may be due to dehydration.  Again, no COVID-19 test was administered, and Mr. Barajas's symptoms continued to persist.

Counsel for Mr. Barajas explains that, during a May 22, 2020 phone call, Mr. Barajas was coughing throughout the call.  (Mot. ⁋ 10.)  Mr. Barajas also reported trouble breathing at night.  (*Id.*)  As he explained on the call, because of his breathing issues, an inmate who had recently been released from the facility provided Mr. Barajas with an inhaler to use.  (*Id.*)  Mr. Barajas had been using this inhaler ever since to alleviate his breathing issues.  (*Id.*)  That same day, Mr. Barajas submitted a new medical request.  (Medical Req. #6,623,622.)  In this request, Mr. Barajas explained that he felt dizzy, had headaches, and, for the first time, he reported an inability to smell.  (*Id.*)  Mr. Barajas testified that he was told he would see a provider for a future evaluation, but that provider evaluation never occurred.

Mr. Barajas supplemented his May 22 request on May 24, 2020.  (Medical Req. #6,629,082.)  In this new request, Mr. Barajas again indicated he was experiencing shortness of breath.  (*Id.*)  Significantly, Mr. Barajas made an explicit request for a COVID-19 test.[3]  (*Id.*)  As a result of these requests, Mr. Barajas was again examined by medical staff at Grady.  (5/25/2020 Request for Medical Needs.)  During this examination, Mr. Barajas's condition was treated as a "chronic common cold" (*id.*), and again the examiner's assessment was that Mr. Barajas had an "[a]lteration in comfort related to mild upper respiratory congestion" (5/25/2020 Nurse Protocols).  Mr. Barajas was directed to "[s]tart Tylenol" and "Mucinex."  Notably, Mr. Barajas testified that, during this visit, he had requested, in person, a COVID-19 test.  (5/25/2020 Req. for Medical Needs.)  Despite both his written and verbal requests,

---

3     During his testimony, Barajas averred that he had made his request for a COVID-19 test on May 22, 2020.

however, Mr. Barajas did not receive a COVID-19 test.  Rather, he testified that medical staff indicated nothing could be done.

Several weeks later, on June 17, 2020, the Court ordered Grady to administer a test to Mr. Barajas to determine whether he had contracted COVID-19.  (ECF No. 118.)  Thereafter, on June 22, 2020, the Court was notified by the Government that Mr. Barajas had tested positive for COVID-19 and had been isolated from the general population.  Grady reports that Mr. Barajas is asymptomatic, never had a fever, and has not exhibited any lowered oxygen saturation.  (ECF No. 121 at 1.)  Mr. Barajas is now isolated, and medical staff at Grady monitor his temperature and oxygen saturation levels twice a day.  (*Id.*) Notably, prior to receiving this test, Mr. Barajas lived in dormitory-style housing with approximately 28 other inmates.  (Mot. ¶ 10.)

On June 29, 2020, by court order, Mr. Barajas was examined by a pulmonologist at the Oklahoma University Medical Center to assess his lung conditions.[4]  (ECF No. 121 at 2.)  In connection with that examination, a radiologist conducted chest x-rays.  (*Id.*)  An examination of the x-rays indicated that Mr. Barajas's chest exhibited "no acute osseous abnormalities."[5]  (6/29/2020 Radiology Interpretation.)  The pulmonologist concluded that "it is hard[] to say if [Mr. Barajas] was really ill from [COVID-19] versus allergies.  Either way, he had a mild case and did not meet any criteria for more intensive or advanced treatment."  (6/29/2020 Telemedicine Visit Pulmonary Consultation Report.)

The next day, on June 30, 2020, Mr. Barajas was evaluated by an infectious disease specialist.[6] That evaluation confirmed that Mr. Barajas had a COVID-19 infection that included symptoms such as a cough, fatigue, myalgia, and shortness of breath.  The specialist indicated that the symptoms had improved, and that Mr. Barajas could be removed from isolation once he tested negative for the virus.

---

4    This examination was conducted remotely, rather than in person.
5    The Court notes that, although an x-ray was taken, no other tests were performed on Mr. Barajas's lungs.
6    This was also a telemedicine appointment, rather than an in-person appointment.

Mr. Barajas was further evaluated on June 30, 2020 by Dr. Cooper.  Dr. Cooper testified that he did not observe any COVID-19 symptoms besides a headache.  Dr. Cooper, however, testified that he did not specifically ask whether Mr. Barajas was manifesting any particular symptom, including loss of smell.  Although it confirms that he reported feeling better, Mr. Barajas's account differs from Dr. Cooper's testimony in a notable way.  Specifically, Mr. Barajas testified that he told Dr. Cooper that he was still experiencing certain symptoms of COVID-19, including shortness of breath at night, loss of sense of smell and taste, and a slight headache.  Therefore, the record appears to be inconsistent as to whether Mr. Barajas is currently asymptomatic.

Two points of concern are worth noting at this time.  *First*, Dr. Cooper revealed that he examined Mr. Barajas in English, without the assistance of an interpreter.  Moreover, the record does not indicate whether Mr. Barajas had previously been examined by medical staff in English or Spanish, or whether any examination was done with an interpreter present.  *Second*, the record further indicates that, despite Mr. Barajas apparently undergoing an intake screening prior to being housed at Grady, medical staff at the facility were not aware that Mr. Barajas had been transferred from Orange County, New York, in April 2020.  Notably, this is when New York State was considered the epicenter of the COVID-19 pandemic.[7]  Both Dr. Cooper and Nurse Sanders conceded that this would have been relevant information to have when examining Mr. Barajas.

### D.  Conditions at Grady

#### 1.  Healthcare and Testing at Grady

Health services at Grady are provided by a private company, Turnkey Health Clinics ("Turnkey").  Dr. Cooper is the Chief Medical Officer for Turnkey, and he oversees all providers that

---

[7] *See, e.g.*, Annie Correal & Andrew Jacobs, *"A Tragedy is Unfolding": Inside New York's Virus Epicenter*, N.Y. Times (Apr. 9, 2020), https://www.nytimes.com/2020/04/09/nyregion/coronavirus-queens-corona-jackson-heights-elmhurst.html; Zak Failla, *COVID-19: Here's Latest Update On Number of Orange County Deaths, Cases*, South Orange Daily Voice (Apr. 30, 2020), https://dailyvoice.com/new-york/southorange/news/covid-19-heres-latest-update-on-number-of-orange-county-deaths-cases/787333/.

provide care to inmate populations served by Turnkey, including Grady.  Nurse Sanders is Turnkey's

Nurse Manager at Grady.  She oversees all nursing staff at the facility.  According to Dr. Cooper, Nurse

Sanders is also responsible for keeping track of medical supplies, including COVID-19 testing kits.

Medical staff at Grady are available 24 hours, seven days a week.  When an inmate needs

treatment, he or she can place a sick call request via a kiosk available in the facility.  Nursing staff at the

facility will review requests from the kiosk twice a day, and typically, upon receipt of a request, an

appointment is scheduled with either a nurse or Grady's nurse practitioner.  Dr. Cooper testified that if

a health complaint is minor, the inmate will be seen by a nurse, and if the complained-of condition is

more serious, the inmate gets sent to the nurse practitioner.  Nurses meet with inmates in person, while,

as a result of the pandemic, the nurse practitioner conducts appointments remotely.

As it relates to COVID-19 testing, the Government had previously represented that Grady has

"sufficient COVID-19 test kits to test anybody who medical professionals deem symptomatic based on"

CDC guidelines.  (ECF No. 117 at 2.)  To that end, Dr. Cooper testified that, prior to Mr. Barajas's

positive test, Grady's policy was to test those individuals who were symptomatic.  Symptoms that were

screened included fever, cough, shortness of breath, loss of taste or smell, headache, body aches, fatigue,

and upper respiratory congestion.  According to Dr. Cooper, this policy was consistent with both CDC

and Oklahoma Department of Health guidelines.  But Dr. Cooper noted that the availability of testing

kits at Grady has changed over time, with an increase in testing supplies occurring in May.  Thus, as of

May 7, 2020, Grady had approximately 10 swab kits available.  The record is unclear as to whether and

how those testing kits were used by Grady, although Dr. Cooper clarified that additional swabs could be

obtained from other jails if the facility needed them.  Testimony indicates that COVID-19 testing kits

are more readily available at Grady.

Grady's COVID-19 testing policy seemingly changed following Mr. Barajas's court-ordered

COVID-19 test's results.  Now, Grady offers COVID-19 tests more broadly to all its federal inmates.

(ECF No. 121 at 2.) However, although COVID-19 tests are being offered to all inmates, they can still choose to decline the test. In such a case, the inmate must sign a waiver form provided by the facility. Accordingly, because testing is not mandatory, it seems as if the true rate of infection at the facility cannot be accurately determined, and it may very well be underreported.[8]

Of note, as Mr. Barajas details in his application, at least one inmate previously under Grady's control has died from COVID-19. (Mot. ¶ 11.)[9] Nurse Sanders testified that she was aware of the incident, as well as the reasons why that inmate had been hospitalized. Although her answers were somewhat evasive, she eventually acknowledged that, despite this incident, Grady ultimately did not administer a COVID-19 test to the rest of its inmate population at that time.

### 2. Inmate Housing and Quarantining

According to Mr. Barajas, conditions at Grady make it impossible for inmates to prevent the spread of COVID-19. (*Id.* ¶ 13.) Because of the close quarters in which they are detained, Grady inmates are unable to practice basic sanitary measures or social distancing. (*Id.*) For example, inmates in the same dormitory unit share a single toilet and shower and rely on a single sink as their only source of drinking water. (*Id.* ¶ 10.) Despite having this shared space, Grady does not provide inmates with cleaning supplies or disinfectants, and the facility does not clean the toilet, shower, and sink between uses. (*Id.*) To complicate things further, inmates are provided only one disposable mask per week.[10]

---

8    As of July 1, 2020, 20 inmates (including Mr. Barajas) and 15 staff members have been diagnosed with COVID-19. The Government explains that Grady houses a total of 681 inmates, 17 of whom had tested negative to date. (ECF No. 117 at 2 n.2.) But, following Barajas's positive test result, Grady offered all 28 inmates housed with Barajas the option to receive a COVID-19 test, with 27 of them declining and one individual receiving a COVID-19 test, which was positive. (ECF No. 121 at 2.) After this latest positive test result, Grady again offered those inmates housed with Barajas an opportunity to be tested, and an unspecified number of inmates accepted the offer.

9    This death was documented by various newspapers in the area. *See, e.g.*, Nolan Clay, *Coronavirus in Oklahoma: Infected Jail Inmate Dies*, The Oklahoman (May 8, 2020), https://oklahoman.com/article/5661898/coronavirus-in-oklahoma-infected-jail-inmate-dies; Jessica Lane, *Grady County Jail Inmate Died of COVID-19*, The Express-Star (May 8, 2020), https://www.chickashanews.com/community/grady-county-jail-inmate-died-of-covid-19/article_d39d00a2-9150-11ea-bb8d-6f15f8a567f1.html.

10   In its June 17, 2020 letter to the Court, the Government represented that "[s]urgical masks are [] made available to inmates twice a week." (ECF No. 117 at 1.) Nurse Sanders further confirmed that masks are provided twice a week, and that additional masks could be obtained if an inmate so requested.

(*Id.*)  During the hearing, Mr. Barajas also revealed that he was sharing a bunk bed with two other inmates prior to being quarantined.  He further noted that this bunk bed was close to other bunks in the dormitory unit.

The Government does not seriously dispute this account.  Instead, it maintains that Grady has policies in place designed to mitigate the spread of COVID-19.  (Opp. 2.)  Those policies include screening new inmates for symptoms of COVID-19 prior to admission into Grady's general housing area, screening staff members on a daily basis, imposing a 14 day quarantine on inmates who have had close contact with an individual who tested positive for COVID-19, increasing cleanings, and issuing masks.  (*Id.*)

Testimony, although at times inconsistent, tended to corroborate this account.  For example, Nurse Sanders provided more details on some of the precautionary measures that Grady staff are taking to prevent contamination.  Specifically, prior to entering the facility, jail staff temperatures are checked, and they are provided with screening questions.  If interacting with inmates, staff are also provided with masks, gowns, and gloves.  Similarly, when medical staff interact with inmates, they are provided with N-95 masks, face shields, gowns, and gloves.

If an inmate tests positive for COVID-19 or is otherwise symptomatic, Grady has a quarantine and sanitation policy in place.  (ECF No. 117 at 2.)  To that end, Grady moves all inmates who have been deemed symptomatic to an isolation unit, and they are quarantined until (a) they test negative or (b) at least 14 days have passed since the onset of the symptoms and they are deemed asymptomatic. (*Id.*)  But, as both Nurse Sanders and Mr. Barajas testified, an isolated inmate is not necessarily quarantined in his own cell.  Rather, as in Mr. Barajas's case, the inmate will be placed in an isolation cell with other inmates who have tested positive.  These inmates have access to a common area, which is, in turn, shared with other inmates who have been isolated due to a positive COVID-19 test.  Nurse Sanders testified that inmates in isolation are offered cleaning supplies to disinfect the common area and

housing area.  However, during his testimony, Mr. Barajas indicated that all he was provided was a bucket of water and a spray that seemingly contained water.

## II.    Procedural Background

On May 21, 2020, defense counsel for Mr. Barajas inquired with Grady officials about where he could request for Mr. Barajas's release due to his apparent COVID-19 exposure.  (Mot. ¶ 18.)  Eric Forsyth, BOP's federal liaison at Grady, advised that because Mr. Barajas was "in transport" at Grady—a non-BOP facility—there was no one to address such a request.  (*Id.*)  Mr. Forsyth advised that a compassionate release application would need to be made with the USMS, who had custody over Mr. Barajas during his transport.  (*Id.*)  Defense counsel then contacted the USMS, who informed him that the request was properly directed at the BOP's Designation and Sentence Computation Center ("DSCC").  (*Id.*)  However, when defense counsel contacted DSCC, he was advised that DSCC could not address his request, and that he should instead proceed directly to this Court with a motion. Thereafter, on May 22, 2020, Mr. Barajas filed his emergency motion for compassionate release.

On June 11, 2020, the Government filed a letter opposing Mr. Barajas's application.  This Court, in turn, held a hearing and determined that more information was needed in order to resolve the motion. Accordingly, the Court issued an order directing (1) BOP and Grady to produce Mr. Barajas's medical records from OCCF and Grady, respectively, and (2) Grady to administer a COVID-19 test to Mr. Barajas.  (ECF No. 118.)  The Court received the medical records by June 18, 2020, and it was then informed of Mr. Barajas's positive COVID-19 test result on June 22, 2020.

The Court held a second hearing on June 25, 2020.  After assessing the parties' positions considering the clear change in circumstances implicated by Mr. Barajas's test result, the Court concluded that an evidentiary hearing was warranted.  The Court issued a second order, dated June 26, 2020, directing Grady's medical director to appear at the evidentiary hearing for testimony.  (ECF No. 120.)  The Court further ordered that Mr. Barajas be examined by an infectious disease specialist and a

pulmonologist.  (*Id.*)  Thereafter, on July 1, 2020, the Court held an evidentiary hearing, during which it heard the testimony of Mr. Barajas, Dr. Cooper, Nurse Sanders, and Ms. Torres.  The Court reserved its decision and this Opinion & Order followed.

## LEGAL STANDARD

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify or reduce the terms of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  The court must find that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  *Id.* § 3582(c)(1)(A)(I).  The court must also consider the factors set forth in section 3553(a) to the extent that they are applicable.  *Id.* § 3582(c)(1)(A).

In other words, for the Court to conclude that a defendant is entitled to relief under Section 3582(c)(1)(A), it must engage in a three-step analysis.  *First*, the Court must determine whether the defendant has exhausted his or her administrative remedies under the terms of the statute.  *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020).  *Second*, the Court must assess whether there are "extraordinary and compelling reasons" to warrant a reduction of his or her sentence.  *Id.*  *Finally*, the Court must examine whether the factors set forth in 18 U.S.C. § 3553(a) outweigh the "extraordinary and compelling reasons" warranting compassionate relief.  *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020).  The defendant bears

the burden of establishing entitlement to relief under Section 3582(c)(1)(A).  *See United States v. Gotti*,

No. 02 CR 743-07 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020).

## DISCUSSION

Mr. Barajas seeks an order modifying his sentence so that he can complete the remainder of his

sentence in home confinement.  (Mot. 1.)  He argues that Grady's inept handling of the COVID-19

situation compromises his ability to obtain adequate medical care in the face of the extraordinary and

unprecedented dangers that COVID-19 presents.  (*See id.* ⁋⁋ 6, 10-12, 19-20.)  If released, Mr. Barajas

would serve the remainder of his sentence at his home in Westchester County and would be subject to

electronic monitoring and any such conditions as the Court deems necessary.  (*Id.* ⁋ 20.)

The Government opposes Mr. Barajas's application.  It argues, *inter alia*, that (1) Mr. Barajas

has failed to establish he suffers from any medical condition that places him at a substantial risk of

complications from COVID-19, and (2) Mr. Barajas's release would present a danger to the safety of the

community due to the risk of others contracting COVID-19.  (Opp. 4-6.)

The Court has considered the parties' briefings and oral arguments, and the testimony of Dr.

Cooper, Nurse Sanders, Mr. Barajas, and Ms. Torres.  The Court will first briefly address the issue of

exhaustion.  Then it will turn its attention to the merits of Mr. Barajas's application.

## I.    Exhaustion

"Section 3582(c)(1)(A) imposes 'a statutory exhaustion requirement' that 'must be strictly

enforced.'"  *United States v. Perez*, No. 17 Cr. 513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1,

2020) (quoting *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4,

2020)).  To this end, courts may consider compassionate release motions brought by an incarcerated

defendant only if he or she has either (1) fully exhausted the administrative process available at the

correctional facility or (2) waited for thirty days after serving his or her petition on the warden of the

facility.  18 U.S.C. § 3582(c)(1)(A).  This statutory mandate notwithstanding, Mr. Barajas maintains that

it would be futile to comply with the exhaustion requirement of Section 3582(c)(1)(A) because he is currently housed in a non-BOP facility and thus there is no BOP official to whom he can address his request. (Mot. ⁋ 18.) The Government does not challenge this position and agrees that the Court should address the merits of Mr. Barajas's request. (Opp. 3.)

Numerous courts in this circuit have concluded that Section 3582(c)(1)(A)'s exhaustion requirement is a claim-processing rule that can be waived. *See, e.g.*, *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 19, 2020) ("The exhaustion requirement in Section 3582(c) is instead a claim-processing rule, which is a non-jurisdictional rule that 'seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'"); *United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020) ("The exhaustion requirement in Section 3582(c) is therefore properly understood as a claim-processing rule, which is a non-jurisdictional rule that 'seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'"); *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *2-3 (S.D.N.Y. Apr. 13, 2020) ("Accordingly, the Court concludes that the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction."). And, as a result, courts have regularly concluded that Section 3582(c)(1)(A)'s exhaustion requirement is either waived or excused in cases where the defendant is currently housed in a non-BOP facility, particularly where, as here, the Government does not challenge the motion on exhaustion grounds. *See, e.g.*, *United States v. Levy*, No. 16-cr-270(ARR), 2020 WL 2393837, at *1 (E.D.N.Y. May 12, 2020) (considering the merits of defendant's application where defendant was not in BOP custody and the Government did not assert exhaustion as a bar to his application); *United States v. Sanchez*, No. 18-CR-833 (VSB), 2020 WL 2787654, at *4 (S.D.N.Y. May 29, 2020) (addressing the substance of defendant's motion where the "Government [did] not challenge [d]efendant's argument that since he is not in BOP custody he need

not attempt to exhaust administrative remedies"); *United States v. Jepsen*, No. 3:19-cv-00073(VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) (finding exhaustion because defendant was "essentially caught in a 'Catch-22'; neither the warden at Wyatt nor the BoP will consider his request because of his designation to Wyatt, a non-BoP facility").

Because Mr. Barajas is currently housed in a non-BOP facility and has been informed that there are no officials with authority to address his request, and considering the Government's agreement on this issue, the Court concludes that the exhaustion requirement has been waived.  In any event, given the circumstances, the Court would be inclined to excuse Mr. Barajas's failure to exhaust as futile.  *See Scparta*, 2020 WL 1910481 at *8 (explaining that Section 3852(c)(1)(A)'s exhaustion requirements are amenable to equitable exceptions, including futility).

## II.   Merits

### A. Mr. Barajas Has Demonstrated "Extraordinary and Compelling Circumstances" Warranting Modification

To be eligible for compassionate relief, a defendant must establish that "extraordinary and compelling reasons warrant [] a reduction [of his or her sentence]" and that "such a reduction is consistent with applicable policy statements issued by the [United States] Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  Under the sentencing guidelines, an "extraordinary and compelling reason[]" exists where, *inter alia*, "[t]he defendant is suffering from a physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A). The Guidelines further provide that a defendant must not be "a danger to the safety of any other person or to the community," and "the reduction must be consistent with [the Commission's] policy statement." *United States v. Ramos*, No. 14 Cr. 484 (LGS), 2020 WL 165812, at *1 (S.D.N.Y. Apr. 7, 2020) (citing U.S.S.G. § 1B1.13(2)-(3)).

Here, Mr. Barajas is a 35-year old male who does not have any explicitly diagnosed medical conditions that would place him at a heightened risk of complications from COVID-19. He instead primarily relies on the fact that he has an undiagnosed asthmatic condition, which appears to be supported by the record.

According to the CDC, individuals with "moderate-to-severe" asthma may be at a higher risk for severe illness from COVID-19. CDC, *People Who Need Extra Precautions: Groups at Higher Risk for Sever Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Mr. Barajas, however, provides no indication, either from his submissions or his testimony, that his asthmatic condition rises to the level of "moderate-to-severe." And none of Mr. Barajas's other conditions are listed as risk factors under CDC guidelines, nor has he shown how they would compound his risk. As a result, if the Court were *only* to consider Mr. Barajas's underlying medical conditions, divorced of any of the underlying circumstances of this case, he would likely not meet Section 3582(c)(1)(A)'s demanding standard. *See, e.g.*, *United States v. Leon*, No. 15-CR-877 (PAE), 2020 WL 3100593, at *2 (S.D.N.Y. June 11, 2020) (noting that although "asthma undoubtedly presents risks related to COVID-19," the defendant was "young and does not have other health conditions that compound that risk"); *United States v. Thaher*, No. 17 Cr. 302-3 (KPF), 2020 WL 3051334, at *5 (S.D.N.Y. June 8, 2020) (denying motion for compassionate release where defendant was "35 years old" and only cited "his elevated cholesterol level as 'an additional cause for concern'" but not that BOP was unable to manage this condition); *United States v. Mascuzzio*, No. 16 Cr. 576 (JFK), 2020 WL 3050549, at *3 (S.D.N.Y. June 8, 2020) (finding no "extraordinary and compelling circumstances" where defendant was 40 years old and did not establish that his asthma was "severe enough to warrant compassionate release"); *United States v. Martinez*, No. 13 Cr. 699 (PAE), 2020 WL 3034808, at *2 (S.D.N.Y. June 5, 2020), *appeal docketed*, No. 20-1983 (2d Cir. June 23, 2020) (denying compassionate

release where defendant was 35 years old and only could cite "high cholesterol" as his condition, noting that obesity would be a considered a risks factor if "severe").

But the Court is not only evaluating Mr. Barajas's application based on his pre-existing conditions. Rather, the Court must consider the full record before it. That includes Mr. Barajas's recent COVID-19 diagnosis and the highly disturbing circumstances surrounding it. In the face of a global pandemic—one that is disproportionately impacting prison populations throughout this country[11]—the record and testimony before the Court has made it abundantly clear that Grady is not up to the challenge of protecting its inmate population from COVID-19. Thus, the Court concludes that continued detention at Grady presents enough of a risk to Mr. Barajas's health so as to constitute "extraordinary and compelling circumstances" for release. Several factors underscore this determination.

As an initial matter, the Court is concerned with Grady's handling of Mr. Barajas's illness. Throughout the month of May, Defendant *repeatedly* reported that he was experiencing hallmark COVID-19 symptoms. (*See, e.g.*, Medical Req. #6,543,618; Medical Req. #6,548,562; Medical Req. #6,591,216; Medical Req. #6,623,622; Medical Req. #6,629,082.). Yet Grady's medical staff appeared to minimize his symptoms as nothing more than a common cold or dehydration. (5/5/2020 Nurse Protocols Document; 5/25/2020 Nurse Protocols Document.). They did so even when Mr. Barajas's objective medical records revealed potential signs of a COVID-19 infection, including headaches and body aches. Although the Government's witnesses attempted to downplay the significance of the objective findings, these symptoms, coupled with Mr. Barajas's subjective complaints, should have raised a red flag. Regardless, even when confronted with Mr. Barajas's explicit request for a COVID-19 test, Grady's medical staff did nothing, knowing full well that we are in the midst of a global pandemic and that Mr. Barajas was in close proximity with at least 28 other inmates. Instead, it bafflingly took a

---

11   Taylor Miller Thomas, *How U.S. Prisons Became Ground Zero for COVID-19*, Politico (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022

court order for Mr. Barajas to be tested for COVID-19. The Government and its witnesses may be adamant that Grady's medical staff were simply following Oklahoma Department of Health and CDC guidelines regarding testing, but that argument is of no moment here. Again, it was evident from the objective assessments found in Mr. Barajas's medical records that Mr. Barajas was "symptomatic" under those guidelines.

The living conditions Mr. Barajas would be subjected to is another factor bearing on the risk to his future health. At the outset, the Government downplays that risk by noting that Grady has cleaning and disinfecting policies in place that are designed to contain the virus, and that such policies are evolving over time. (ECF No. 117 at 1-2; ECF No. 121 at 2.) However, as Mr. Barajas testified, the ability for inmates to comply with social distancing requirements appears to be impossible. Inmates share a single toilet and shower, and their source of drinking water is confined to a single sink. (Mot. ¶ 10.) Moreover, inmates sleep in close quarters, with up to three inmates sharing a bunk. And cleaning supplies and disinfectants are not provided to inmates, and thus showers, toilets, and sinks are not cleaned between uses. (*Id.*) Despite Grady's documented adaption to the COVID-19 pandemic, there is no indication from the record that these living conditions would change upon Mr. Barajas's return to the general population after quarantine. Indeed, as the testimony of Nurse Sanders and Mr. Barajas both revealed, it appears that, even when he is isolated, it is difficult for Mr. Barajas to avoid exposure from inmates who have also tested positive for the virus and to keep his living areas decontaminated. If anything, this case is a textbook example of why "[i]ndividuals in carceral settings are at a '*significantly higher*' risk of spreading infectious diseases." *United States v. Gross*, 15-cr-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Mar. 31, 2020) (internal citations and quotations omitted).

Similarly concerning is Grady's current testing practices. As Dr. Cooper testified, Grady will now be able to test any federal inmate who requests a test by the end of the week. But as both the Government's submission and Dr. Cooper's testimony reveal, these COVID-19 tests are entirely

optional.  (*See, e.g.*, ECF No. 121 at 2.).  Instead, inmates are at full liberty to decline to be tested, and

many of those inmates who were living in the same "pod" as Mr. Barajas, in fact, exercised that option.

(*Id.*)  Accordingly, the Court has serious doubts regarding Grady's ability to accurately assess the number

of COVID-19 cases within its inmate population.

In the backdrop of all these issues at Grady is our lack of understanding about COVID-19.  In

general, we still know extraordinarily little about the long-term prognosis for a patient diagnosed with

COVID-19.  Indeed, although the Government and its witnesses stunningly minimize Mr. Barajas's

condition as mild or asymptomatic, some research, to date, at least indicates that the absence of severe

symptoms does not necessarily diminish the risk of long-term health complications.[12]  *See, e.g.*, Pien

Huang, *We Still Don't Fully Understand the Label "Asymptomatic,"* NPR (June 23, 2020),

https://www.npr.org/sections/goatsandsoda/2020/06/23/864536258/we-still-dont-fully-understand-the-

label-asymptomatic ("The study shows that being asymptomatic doesn't always mean that no damage

has occurred in someone's body; follow-up studies will help researchers assess for potential long-term

impacts.").  There is also a palpable, although admittedly uncertain, possibility of reinfection—a concern

that is accentuated by Grady's handling of this situation. *See* CDC, *Interim Clinical Guidance for*

*Management    of    Patients    with    Confirmed    Coronavirus    Disease    (COVID-*

*19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

("There are no data concerning the possibility of re-infection with SARS-CoV-2 after recovery from

COVID-19."); World Health Org., *"Immunity Passports" in the Context of COVID-19* (Apr. 24, 2020),

https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19

("There is currently no evidence that people who have recovered from COVID-19 and have antibodies

---

12  The Court is mindful that other courts in this district have denied compassionate release applications after the defendant had ostensibly recovered from an infection.  *See, e.g., United States v. Zubkov*, No. 14-cr-773 (RA), 2020 WL 2520696, at *3 (S.D.N.Y. May 18, 2020) (denying application where defendant was "already diagnosed with COVID-19," had recovered," and did not show that his symptoms were "extremally serious" in first place).  But in that case, the adequacy of defendant's medical care was not seriously in question.

are protected from a second infection."); *see also* Physician's Weekly, *Risk for COVID-19 Reinfection Remains Unknown* (June 18, 2020) https://www.physiciansweekly.com/risk-for-covid-19-reinfection-remains-unknown/ (detailing that although there is some evidence that other common coronaviruses have had instances of repeated infections, it is unclear if this will apply to COVID-19). When these uncertainties are coupled with the fact that Mr. Barajas has already been infected once and may very well have an undiagnosed asthmatic condition, there is a very real risk that re-exposure to the virus could spell disaster for Mr. Barajas, a risk that appears to be heightened at Grady. *Cf. United States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting compassionate release application of inmate with underlying medical conditions who was infected with COVID-19, but did not develop severe symptoms, because of, among other things, risk that reinfection would have on the inmate's health); *United States v. Williams*, No. 19-cr-134-PWG, 2020 WL 3073320, at *4 (D. Md. June 10, 2020) (granting compassionate release application where defendant with an underlying health condition had contracted COVID-19 but recovered because "it [was] uncertain whether [defendant] [could] contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined" when factoring his health condition).

To be sure, it is possible that Mr. Barajas would return to the general population with no issues. But in these uncertain times, confronted with a disease about which we know extraordinarily little and knowing Mr. Barajas is in the hands of a facility that has not, to date, adequately prioritized his health, the Court is unwilling to take that gamble. Given the totality of the circumstances, the Court is persuaded that Mr. Barajas's continued confinement at Grady would "substantially diminish" his ability to provide self-care in a carceral setting given his current physical and medical condition. U.S.S.G. § 1B1.13(1)(A)

& cmt. n.1(A).  Accordingly, Mr. Barajas has established, on these specific facts, "extraordinary and compelling circumstances" warranting compassionate release.[13]

## B. The Section 3553(a) Factors Do Not Outweigh the "Extraordinary and Compelling Circumstances"

In addition to determining whether "extraordinary and compelling reasons" warrant release, courts must also "consider[] the factors set forth in section 3553(a) to the extent they are applicable." *United States v. Gentile*, No. 19 Cr. 590 (KPF), 2020 WL 1814158, at *4 (S.D.N.Y. Apr. 9, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).  These factors include:

> (1) 'the nature and circumstances of the offense and the history and characteristics of the defendant;' (2) 'the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;' (3) 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;' (4) the sentencing guidelines; and (5) 'the need to provide restitution to any victims of the offense.

*Ramos*, 2020 WL 1685812 at *2 (quoting 18 U.S.C. § 3553(a)).  The critical inquiry is "whether [these factors] outweigh the 'extraordinary and compelling reasons' warranting compassionate release[.]" *United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020).

The Court previously considered the section 3553(a) factors at the time of Mr. Barajas's sentencing and is intimately familiar with their applicability to this case.  During sentencing, the Court's consideration of those factors warranted a below-guidelines sentence of 27 months' imprisonment.  Now, given the present circumstances, the Court concludes that, at this time, a modified sentence of home

---

[13] The Government's remaining arguments can easily be resolved.  *First*, to the extent the Government expresses concerns regarding Mr. Barajas's threat to public health (Opp. 5), such concerns will be mitigated by the fact that Mr. Barajas must first be medically cleared before can be released from quarantine.  A modification of his sentence is conditioned on that requirement.  *Second*, although the Government notes that Mr. Barajas would be subject to a detainer filed with the BOP by the United States Immigration and Customs Enforcement (*id.*), it indicated during the June 17, 2020 hearing that any removal proceedings would begin after he served his period of home confinement.

confinement for the balance of Mr. Barajas remaining period of incarceration would be "sufficient, but not greater than necessary" to promote the proper objectives of sentencing.

*First*, Mr. Barajas's participation in a narcotics conspiracy in which he distributed, or possessed with intent to distribute, significant quantities of cocaine is undoubtedly serious.  But, as even the Government conceded at sentencing, his role was not nearly as significant as the Government alleges regarding several of the other defendants.  In any event, Mr. Barajas crime was non-violent.

*Second*, as reflected in the presentence investigation report, Mr. Barajas has no prior criminal history, such that his criminal history score was zero and he was placed in a criminal history category of I (one).  (PSR ‖ 43.)  Given this fact, as well as the nature of his crime, there is no reason for the Court to conclude that Mr. Barajas poses a danger to the community upon release.

*Finally*, Mr. Barajas has served a significant portion of his sentence and will be eligible for release in about two months.  *See Sawicz*, 2020 WL 1815851 at *3 ("Further militating in favor of the defendant's release is the fact that the defendant is less than five months away from the date on which he would be eligible for release to home confinement under normal circumstances.").  The Court therefore has no trouble concluding that the "time [defendant] has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose[s]." *United States v. Ozols*, No. 16-CR-692-7 (JMF), 2020 WL 2849893, at *1-2 (S.D.N.Y. June 2, 2020) (quoting *United States v. Pena*, 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020)) (concluding that the section 3553(a) factors did not outweigh extraordinary and compelling circumstances, where defendant had served three-quarters of his sentence and was "not the mastermind" behind the conspiracy charged).  Moreover, the fact that Mr. Barajas has a short amount of time left in his sentence effectively minimizes any sentencing disparities between him and similarly situated defendants.

In short, a modification of Mr. Barajas sentence would not be inconsistent with the section 3553(a) factors.  Accordingly, Mr. Barajas's compassionate release application is GRANTED.

## CONCLUSION

For the foregoing reasons, Mr. Barajas's motion for compassionate release is GRANTED. The Court hereby orders that:

1. Mr. Barajas's sentence is modified to time served, with the remainder of the sentence he would otherwise have served (as calculated by the Bureau of Prisons) to be served on supervised release, a special condition of which is that Defendant shall be in home confinement with electronic monitoring during his period of supervised release.

2. Mr. Barajas's release is conditioned on his testing negative for COVID-19. He is to remain in isolation at Grady until he is medically cleared under applicable CDC guidelines. Once Mr. Barajas is medically cleared, he is to be released from Grady's custody **immediately** to begin his home confinement.

3. Mr. Barajas will continue to be subject to the previously imposed term of supervised release, including all standard, mandatory, and special conditions of supervision delineated at sentencing by the Court. Upon his release, Mr. Barajas is to report to the nearest Probation Office within 72 hours.

The Clerk of Court is directed to terminate the motion at ECF No. 126.

Dated:   July 13, 2020
         White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge